IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ASHLI and GORDON C., individually and on behalf of their minor child, SIDNEY C. | ) ) ) ) | CIVIL NO. 05-00429 HG-KSC |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| STATE OF HAWAII, DEPARTMENT OF EDUCATION AND PAT HAMAMOTO, in her official capacity as Superintendent of the Hawaii Public Schools, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**ORDER AFFIRMING THE JUNE 9, 2005 DECISION OF THE HEARINGS OFFICER AND DENYING PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES AND COSTS**

Plaintiffs Ashli and Gordon C., individually and on behalf of their minor child, Sidney C., bring this administrative appeal against the State of Hawaii, Department of Education and Pat Hamamoto, in her official capacity as Superintendent of the Hawaii Public Schools, pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400, et seq. Sidney is a third grade student diagnosed with Attention Deficit Hyperactivity Disorder.

An administrative law judge heard this case on April 14, 15, and 21, 2005.  Plaintiffs claim that the administrative law judge erred in determining that Plaintiff Sidney was ineligible for special education and related services under the Individuals with

1

Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400, and the Rehabilitation Act of 1973, Section 504, 29 U.S.C. § 794 ("Section 504"), and the corresponding Hawaii Administrative Rules.  If, as Plaintiffs contend, the administrative law judge erred in excluding Sidney for eligibility under the IDEA and Section 504, Plaintiffs seek reimbursement for funding a private tutor.

The DOE voluntarily provides Sidney with differentiated instruction.  The DOE contends that Sidney is receiving an education in the regular classroom and is not eligible for IDEA and Section 504 special education and related services.

For the reasons set forth below, the Court AFFIRMS the decision of the Hearings Officer and DENIES Plaintiffs' request for costs and attorneys' fees.

**PROCEDURAL HISTORY**

On March 14, 2005, Sidney, by and through his parents Ashli C. and Gordon C., filed a Request for Impartial Hearing against the Department of Education, State of Hawaii ("DOE").  Plaintiffs alleged that the DOE improperly deemed Sidney ineligible for special education and related services under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400, <u>et</u> <u>seq</u>. (Administrative Record on Appeal ("RA") Exh. 1-3.)

On April 14, 15, and 21, 2005, the Office of Administrative Hearings conducted an administrative hearing ("April 2005 due

2

process hearing").  (April 14, 2005 Hearing Transcript "4/14/05 Tr.", April 15, 2005 Hearing Transcript, "4/15/05 Tr.", April 21, 2005 Hearing Transcript "4/21/05 Tr.").

On June 9, 2005 the Office of Administrative Hearings, Department of Commerce and Consumer Affairs, State of Hawaii, issued its "Findings of Fact, Conclusions of Law and Decision" (RA Exh. 12, hereinafter "June 2005 Decision").

On July 8, 2005, Plaintiffs filed a Complaint appealing the June 2005 Decision.

On March 2, 2006, the Court received the administrative record on appeal.

On April 10, 2006, Plaintiffs filed an opening brief.

On June 13, 2006, Defendants filed an answering brief.

The parties waived oral argument and the Court took the matter under advisement without a hearing.

**BACKGROUND**

Sidney was a third grader at Mauanawili Elementary School ("Mauanawili") during the relevant time period.  (4/14/05 Tr. at 21.)  Sidney has been diagnosed with ADHD.  (DOE Exh. 46 at SC 103; June 9, 2005 Decision at 4.)  A pediatric neurologist initially prescribed Ritalin LA (20mg), and later prescribed Concerta (36 mg), to treat Sidney's ADHD.  (June 9, 2005 Decision at 4-5.)  In February 2005, Sidney's mother took Sidney off the ADHD medication because she was concerned about its long term

effects.  (<u>Id</u>. at 5.)  At issue in this case is Sidney's
eligibility for special education services under the IDEA and/or
Section 504 of the Rehabilitation Act.

**I.   Determination of Eligibility Under the IDEA**

On January 14, 2004, Plaintiffs submitted a Request for
Evaluation regarding Sidney's academic performance and
social/emotional behavior.  (Pl. Exh. 1.)  The Request stated
that Sidney struggles with mathematics, is easily distracted, has
some hyperactivity, and gets frustrated quickly with homework.
(<u>Id</u>.)  In response, Sidney underwent a comprehensive evaluation.

**A.   March 2004 Eligibility Meeting**

The DOE evaluated Sidney in January 2004 (DOE Exh. 39),
February 2004 (DOE Exh. 40), and March 2004 (DOE Exh. 41) in
order to determine whether he qualified for special education and
related services under the IDEA.

The DOE held the first eligibility meeting on March 9, 2004
(4/14/05 Tr. at 154-55; DOE Exh. 3.)  At the meeting, Sidney's
Eligibility Determination Team ("Team") -- consisting of the
Principal, Student Services Coordinator, Counselor, Special
Education Teacher, Regular Education Teacher and Sidney's mother
and father -- convened in order to review the results of Sidney's
Spring 2004 Evaluations.  (<u>Id</u>.)  The Team considered whether
Sidney qualified for special education and related services under
the categories of "Specific Learning Disability" or

4

"Speech/Language Impairment".  (4/14/05 Tr. at 160.); see HAR §§ 8-56-26, 8-56-27.  The Team considered a questionnaire with personal background information, a classroom observation and three evaluations/assessments.

Upon examining Sidney's eligibility for special education and related services under the category "Specific Learning Disability" ("SLD")the Team determined that he was not eligible because Sidney's relevant test scores were above the SLD eligibility threshold of 60.  (DOE Exh. 3 at SC 4; 4/14/05 Tr. at 163-168.)  The SLD eligibility threshold of 60 was determined by taking Sidney's full scale score on the Stanford-Binet IQ test of 82 and subtracting 1.5 deviations (22 points).  The scores from Sidney's academic and speech language assessments (DOE Exh. 39 and 40) showed that Sidney's academic performance was above the SLD level.  (DOE Exh. 3 at SC 4.)  Sidney's scores in the following areas were:  Oral Expression - 98, Listening Comprehension - 102/106, Basic Reading Skills - 117, Reading Comprehension - 98, Mathematics Calculation - 103, Mathematics Reasoning - 99, and Written Expression - 136.  (Id.)

Upon examining Sidney's eligibility for special education and related services under the category "Speech/Language Impairment" the Team likewise determined that he was not eligible based on its determination that Sidney did not exhibit a significant problem in the comprehension and/or production of an

5

oral communication system.   (4/14/05 Tr. at 169-70; DOE Exh. 3 at

Bates No. SC 5.)

A Prior Written Notice of Department Action summarized the

Team's conclusions following the March 9, 2004 meeting:

> There is no evidence of a learning disability.
> [Sidney's] measured cognitive or intellectual ability as
> measured on the Stanford-Binet Intelligence Scales-Fifth
> Edition indicates ability in the low average range evenly
> across verbal and nonverbal channels.  His academic
> achievement as measured on the Weschler Individual
> Achievement Test-Second Edition indicates reading in the
> above to average range, math at the average range,
> writing at the above average range and listening
> comprehension at the average range for his age level.  No
> discrepancy between achievement and ability is
> demonstrated other than he is currently achieving at a
> rate higher than his ability level.

(DOE Exh. 13.)

**B.   January 2005 Eligibility Meeting**

Nine months later, on January 13, 2005, the Team reconvened

to re-examine Sidney's eligibility for special education and

related services under the IDEA.  (4/14/05 Tr. at 203; DOE Exh.

8.)  At the January 2005 meeting, the participants included the

Principal, Student Services Coordinator, Counselor, Classroom

Teacher, Special Education Teacher, Occupational Therapist, an

advocate from the Hawaii Disabilities Association, and Sidney's

mother and maternal grandmother.  (DOE Exh. 8.)

Between March 2004 and January 2005, Sidney underwent a

series of additional evaluations, at Plaintiffs' expense, to

provide the Team with more information on his academic and

intellectual abilities.  (4/14/06 Tr. at 175; DOE Exh. 46, 48,
51, 52, 54, 56, and 57.)  At the meeting, the Team looked at
whether Sidney was eligible under the categories of "Mental
Retardation" ("MR"), "Other Health Impairment" ("OHI"), and
"Specific Learning Disability" ("SLD").  (4/14/05 Tr. at 206.);
see HAR §§ 8-56-26, 8-56-25, and 8-56-22.

    Upon review of the available information, the Team
determined that Sidney did not have sub-average general
intellectual functioning so as to fit within the definition of
"Mental Retardation" under the regulations (HAR § 8-56-22.)
(4/14/05 Tr. at 220-22; DOE Exh. 8.)  The DOE determined that
there was no evidence that Sidney had any deficits in the
adaptive skills areas.  (4/14/05 Tr. at 221; DOE Exh. 8.)

    With regard to Sidney's eligibility under the SLD category,
the DOE considered his IQ Score minus the 1.5 standard deviation
of 22 points.  Based on the March 2004 assessment, Sidney's full
scale IQ score was 82.  Based on the Plaintiffs' assessment
Sidney's full scale IQ score was 83.  Using a 22-point deviation,
these scores resulted in an eligibility threshold of 60 or 61.

    The results from the tests arranged for by Sidney's mother
were, for the areas tested, similar to the test results from the
Spring 2004 assessment examined at the March 2004 eligibility
meeting.  Based on the Plaintiffs' tests, Sidney's scores in the
following areas were:  Basic Reading Skills - 114/115 (83rd

percentile), Reading Comprehension - 99, Mathematics Calculation - 115 (85th percentile), Mathematics Reasoning - 98 (44th percentile), and Written Expression - 120 (91st percentile). (DOE Exh. 8 at SC 14; Pet. Exh. 13 at SC 51.)  Because Sidney's test scores were above the eligibility threshold of 60 or 61, the DOE determined that he was not eligible for special education and related services under the category of SLD.  (4/14/05 Tr. at 215.)

Finally, because Sidney was diagnosed with ADHD, the DOE considered whether he was eligible for services under the Other Health Impaired ("OHI") category.  From the assessments, the DOE concluded that Sidney was able to keep up with his peers and his ability level, and he was not going to fail his class.  Despite his ADHD diagnosis he was able to perform academically and socially.  (4/14/05 Tr. at 217.)  Based on the evidence, the DOE determined that Sidney's diagnosis of ADHD did not adversely affect his educational performance.

The Team's conclusions were summarized in a Prior Written Notice of Department Action following the January 13, 2005 meeting.  (DOE Exh. 16.)  With regard to the OHI category, the Prior Written Notice provides:

> While there is a medical diagnosis of Attention Deficit Hyperactive Disorder, evidence does not support that this limits his strength, vitality or alertness including heightened alertness to environmental stimuli in the educational setting/classroom.  Evidence does indicate that he

8

> is performing at or close to grade level in his
> educational performance with differentiated
> instructional supports under Comprehensive Student
> Support Services general education program.

(DOE Exh. 16.)

## II.   Determination of Eligibility Under Section 504

After receiving notice that the DOE denied Sidney's request for special education services under the IDEA and Chapter 56 of the Hawaii Administrative Regulations, the Plaintiffs requested an independent educational evaluation under the Rehabilitation Act of 1973, Section 504 and the state implementing regulations -- Chapter 53 of the Hawaii Administrative Rules, HAR § 8-53-1, _et seq_. (4/14/05 Tr. at 228-29.)  Approximately one month later, in February 2005, the DOE considered whether Sidney was eligible for special education and related services under Section 504 and Chapter 53. (4/14/05 Tr. at 229-30.)

On February 8, 2005, Mauanawili convened a student support team meeting to make this determination.  (4/14/05 Tr. at 229-30; DOE Exh. 9.)  The student support team ("SST") included the Principal, Student Services Coordinator, Counselor, Classroom teacher, and Sidney's mother, father and grandmother.  (DOE Exh. 9.)

With regard to Sidney's eligibility under Section 504/Chapter 53, the SST considered whether Sidney's diagnosis of ADHD placed a substantial limitation on any major life activity. (4/14/15 Tr. at 230.)  Along with other information, the SST

9

looked at the historical evidence; cognitive, academic, and occupational therapy evaluations; the medical diagnosis; personal background information; and evaluations on classroom performance. (4/14/05 Tr. at 231; DOE Exh. 69.)  The SST concluded that there was no evidence that Sidney's diagnosis of ADHD placed a substantial limitation on a major life activity such as caring for himself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  (4/14/05 Tr. at 239-41, DOE Exh. 18.)

On March 14, 2005, Sidney's mother filed a Request for Impartial Hearing, claiming that Sidney "should have been made eligible for IDEA services and/or Section 504."  (DOE Exh. 25.)

## III. June 9, 2005 Findings of Fact, Conclusions of Law and Decision

On April 14, 15, 21, 2005, the Office of Administrative Hearings, Department of Consumer Affairs, held hearings on Plaintiffs' March 14, 2005 impartial hearing request.  (RA at Exh. 12, "June 9, 2005 Decision".)  The Hearings Officer considered:

> (1)   Whether [the DOE] properly evaluated [Sidney] and determined whether he was eligible for special education and related services under HAR Title 8, Chapter 56 in the categories of MR, OHI, and SLD at the January 13, 2005 Eligibility meeting; and

> (2)   Whether [the DOE] properly evaluated [Sidney] and determined whether he was eligible for modifications and accommodations under HAR Title 8, Chapter 53, due to his diagnosis of ADHD, at the February 8, 2005 Student Support Team meeting.

10

(Id.)

In answering these questions, the Hearings Officer considered the evidence presented at the hearing and Sidney's numerous evaluations including his speech-language assessment, academic assessment, cognitive assessment, psychological evaluations, occupational therapy assessments, neuropsychological evaluations, visual information from an optometrist, observations by student services coordinator, and observations and oral reports of Sidney's classroom teacher. (Id.) The Hearings Officer also considered the fact that Sidney's classroom teacher testified that: he fell within the majority of her student's performance levels; he was meeting or approaching educational standards; and she was refocusing Sidney just as much as she was refocusing half the other children in the class. (Id.)

Sidney's classroom teacher testified that she provided him with differentiated instruction in the classroom. Sidney received additional time and highlighting of directions during test taking; was moved closer to the teacher during tests; his test papers were folded so he only had to complete half the test at a time; in addition to reading the directions to himself, his teacher read the test directions to him; and it was possible for him to receive additional explanation when learning a lesson. (Id.)

The Hearings Officer concluded that Sidney "was in the

average range in his cognitive and achievement scores" and that

he "was approaching or meeting proficiency in all relevant

content areas identified by Hawaii Content and Performance

Standards requirements." (<u>Id</u>.)  The Hearings Officer found that

there was either no or insufficient evidence for Sidney to be

eligible for special education and related services in the

categories of Mental Retardation ("MR"), Other Health Impaired

("OHI"), and Specific Learning Disability ("SLD"), and held that

the DOE properly concluded that Sidney was not eligible for

services under the IDEA or Section 504.  (<u>Id</u>.)  With regard to

the OHI category, the Hearings Officer found that Sidney's

"disability (ADHD), did not adversely affect his educational

performance. (HAR §8-56-25)". (<u>Id</u>.).  Based on these findings,

the Hearings Officer concluded that the DOE was not required to

reimburse Plaintiffs for Sidney's private tutoring.  (<u>Id</u>.)

<strong><u>STANDARD OF REVIEW</u></strong>

In evaluating an appeal of an administrative decision under

the IDEA, a district court "shall receive the records of the

administrative proceedings...shall hear additional evidence at

the request of a party; and...basing its decision on the

preponderance of the evidence, shall grant such relief as the

court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

The Supreme Court articulated its interpretation of the

statute's standard of review in <u>Board of Educ. of the Hendrick</u>

12

Hudson Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S.
176, 206 (1982).  "[T]he provision that a reviewing court base
its decision on the 'preponderance of the evidence' is by no
means an invitation to the courts to substitute their own notions
of sound educational policy for those of the school authorities
which they review."  Id.  The statute requires that "due weight"
be given to the findings in the administrative proceedings.  Id.;
see Seattle School Dist., No. 1 v. B.S., 82 F.3d 1493, 1499 (9th
Cir. 1996) ("The Ninth Circuit . . . like the district court,
must give deference to the state hearing officer's findings,
particularly when, as here, they are thorough and careful.  This
court also must give due weight to judgments of education policy
when [we] review state hearings.... [C]ourts should not
substitute their own notions of sound educational policy for
those of the school authorities which they review.") (citations
and quotations omitted).

     The Ninth Circuit Court of Appeals has held that the amount
of deference given to an administrative hearings officer's
findings depends on the thoroughness of the findings.  Capistrano
Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir.
1995).  More deference is accorded when the hearings officer's
findings are "thorough and careful."  Id.  The court has
discretion to decide the amount of deference it gives to the
administrative findings.  County of San Diego v. California

13

Special Educ. Hearing Office, 93 F.3d 1458, 1466 (9th Cir. 1996).
The ultimate determination of the appropriateness of the
educational program is reviewed *de novo*. Capistrano, 59 F.3d at
891.

Under IDEA's regulations, a child must be assessed to
identify all of the child's special education and related
services needs.  34 C.F.R. § 300.304.  The IDEA does not provide
substantive goals for an evaluation, but provides only that it be
"reasonably calculated to enable the child to receive educational
benefits[.]"  Rowley, 458 U.S. at 206-07.

## ANALYSIS

### I.    Level of Deference Due Hearings Officer

The Court affords the Hearings Officer's June 9, 2005
Decision deference.  The June 9, 2005 Decision is thorough and
careful.  The Hearings Officer considered and discussed the
testimony of the witnesses at the hearing in reaching her
determination that Sidney was not eligible for special education
services under the IDEA or Section 504.  The Decision considers
all of the evaluations and other evidence at length.  The
Hearings Officer's Decision is entitled to deference.
Capistrano, 59 F.3d at 891.

### II. Burden of Proof

At the administrative hearing, the school district bears the
burden of proving that its evaluation and proposed student

14

placement complied with the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 et seq. ("IDEA") requirements. Seattle School Dist., No. 1, 82 F.3d at 1498-99.  The party challenging the administrative decision bears the burden of proof in seeking review in the district court.  See Clyde K. v. Puyallup School District, No. 3, 35 F.3d 1396, 1399 (9th Cir. 1994).

## III. Alleged Errors in the Hearings Officer's Decision

### A.   Substantive Denial of FAPE

A child with a suspected learning disability must meet the statutory criteria for "child with a disability" to receive IDEA protection.  20 U.S.C. § 1401(3).  The parties dispute whether Sidney is a "child with a disability" under the federal and state definitions such that he is qualified for special education and related services under the IDEA.  See 20 U.S.C. § 1412(a)(1)(A). Under the IDEA, the term "child with a disability" means a child:

> (i) with mental retardation, hearing impairments . . . other health impairments, or specific learning disabilities; and
>
> (ii) who, by reason thereof, needs special education and related services.

20 U.S.C. § 1401(3)(A).

Generally, "[t]o qualify under IDEA, a child must satisfy three criteria: (i) he must suffer from one or more of the categories of impairments delineated in IDEA, (ii) his impairment must adversely affect his educational performance, and (iii) his

qualified impairment must require special education and related services."  <u>Capistrano Unified School Dist.</u>, 59 F.3d at 899.

Chapter 56 of the Hawaii Administrative Rules ("HAR") implements the IDEA.  HAR Chapter 56, subchapter 4, delineates criteria for determining whether a student qualifies as a student with a disability so as to be eligible for special education and related services under the IDEA.  Because Sidney has been diagnosed with ADHD, he potentially falls within the "other health impairment" ("OHI") category for IDEA eligibility.

The only issue raised in Plaintiffs' appeal is whether the Hearings Officer properly determined that Sidney's ADHD did not adversely affect his educational performance.  (Pl. Brief at 5.) This is one of the requirements for eligibility under the OHI category set forth in HAR § 8-56-25.  The federal regulations similarly require that the student's condition adversely affect his educational performance.  <u>See</u> 34 C.F.R. § 300.8(c)(9). Plaintiffs have not sought review of the Hearings Officer's decision regarding Sidney's eligibility for special education services under any other category.[1]

HAR § 8-56-25 sets forth the standard for eligibility under

_____

[1] Plaintiffs argue only that Sidney's ADHD adversely affected his educational performance.  Plaintiffs do not challenge the Hearings Officer's findings which excluded him from eligibility under the other IDEA categories of Mental Retardation ("MR") and Specific Learning Disability ("SLD") or under Section 504 of the Rehabilitation Act.

the category at issue in this appeal, the OHI category:

> A student shall be eligible under the category of other health impairment if both of the following are met:
>
> > (1) The student has limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems or a medically fragile condition such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia; and
> >
> > (2) The health impairment ***adversely affects the student's educational performance***.

HAR § 8-56-25 (emphasis added); <u>see</u> 34 C.F.R. § 300.8(c)(9).

Plaintiffs contend that Sidney qualifies as a student with a disability under the OHI category because his ADHD has an adverse effect on his educational performance. Plaintiffs acknowledge that the DOE has voluntarily undertaken measures, namely differentiated instruction, to address Sidney's ADHD. (Pl. Brief at 4-5.) The differentiated instruction included individual attention in the classroom such as 1-on-1 work with Sidney's classroom teacher and the development of an intervention plan. (4/14/05 Tr. at 38-39.) Plaintiffs argue that the DOE should have considered the effects of Sidney's ADHD on Sidney's educational performance without taking into account the changes Sidney's classroom teacher made in the regular classroom.

Plaintiffs also argue that even with the differentiated

instruction, Sidney's educational performance is adversely affected because he suffers some negative impact from his ADHD. Plaintiffs contend that the word "adversely" as used in the regulations means "negatively", such that a student is eligible for special education services under the IDEA if there is any evidence, even if minimal, that the student's health impairment negatively impacts his educational performance. (Pl. Brief at 6; 4/15/05 Tr. at 442.)  Plaintiffs claim that Sidney's teacher admitted that he sustained a negative impact in his educational performance, even with all of her efforts, and that the student services coordinator agreed. (Pl. Brief at 4-5; citing Tr. at 81:21-24, 82:1-5, 328:11-19.)

The DOE responds by submitting that the meaning of "adversely" as used in HAR § 8-56-25 is unclear. (Response Brief at 17-18.)  Neither the IDEA nor the federal or state regulations define "adversely affects."[2]  See J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 66 (2nd Cir. 2000) (federal regulations do not define the phrase "adverse effect on educational

---

[2] Some state regulations do define "adversely affects". Under Vermont's special education regulations, for instance, the term "adversely affects" requires that the evaluation and planning team "determine and document that, as a result of his or her disability, the student is functioning significantly below age and grade norms for age and grade peers in one or more of the basic skills . . . "  Vt. Code. R. § 2362(c).  The term "significantly below age or grade norms" means diminished performance on certain empirical measures, "generally over a six month period of time."  Id.

performance." Instead, "each State [gives] substance to these terms.").

Under general principles of statutory construction, the DOE urges the Court to examine the context with which the ambiguous phrase may be compared in order to ascertain its true meaning. See State v. Rauch, 13 P.3d 324, 331 (Haw. 2000) ("In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.").

To that end, the DOE directs the Court's attention to Board of Education of Hendrick Hudson Central School District v. Rowley, 458 U.S. 176 (1982). In Rowley, the United States Supreme Court recognized that Congress' central concern in passing the IDEA was to provide handicapped children with meaningful access to public education. Id. at 191-92. The Rowley Court noted that "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." Id. at 192. Although Rowley was not an eligibility case, based on the idea of meaningful access, the DOE urges the Court to interpret "adversely affect educational performance" to refer to a student's inability to perform in a regular classroom designed for non-handicapped students. (Response Brief at 18.)

19

The Court agrees with the DOE that whether a student's disability "adversely affects" his "educational performance" refers to the student's ability to perform in a regular classroom designed for non-handicapped students.  If a student is able to learn and perform in the regular classroom taking into account his particular learning stye without specially designed instruction, the fact that his health impairment may have a minimal adverse effect does not render him eligible for special education services.

In reaching this conclusion, the Court need not find the phrase "adversely affects" ambiguous.  Because "adversely affects" is undefined, the Court looks to its ordinary meaning.  See State v. Chen, 884 P.2d 392, 400 (Haw. App. 1994) ("[O]rdinary meanings are attached to terms not given a statutory definition.").  To determine the phrase's ordinary meaning, the Court looks to the dictionary definition of "adverse".  Id. ("Resort to legal or other well accepted dictionaries is one way to determine the ordinary meanings of certain terms."); see United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006, 447 F.3d 686, 689 (9th Cir. 2006) (court followed common practice of consulting dictionary definitions where statute did not define terms).  At the time HAR § 8-56-25's was enacted, Merriam Webster's Collegiate Dictionary defined "adverse" as: 1) acting against or in a contrary direction; 2) opposed to one's

interests or causing harm; or 3) opposite in position.  Merriam Webster's Collegiate Dictionary, (10th ed. principal copyright 1993, updated through 2002).

In this context, "causing harm" or harmful is the most applicable ordinary meaning of "adverse".  Where a student such as Sidney is able to learn and function at an average level in the regular classroom and experiences only a slight impact on his educational performance, it cannot be said that the student is harmed.

The evidence shows, as the Hearings Officer found, that Sidney's evaluations did not show a discrepancy between his ability and his achievement such that Sidney was suffering an adverse effect on his educational performance.  Sidney's classroom teacher testified that Sidney was doing better in class and recognized only a very minimal impact on Sidney's educational performance.  At the administrative hearing, Sidney's classroom teacher testified:

Q:      Since you've utilized and implemented these intervention and differentiation strategies, Sidney's attentional problems have become less; correct?

A:      Less than before, correct.

Q:      It has helped Sidney not have significant and negative impact on his learning?  It has lessened the significant and negative impact on his learning?

21

A:      Looking at his assessment scores and everything
        since he's shown that he's improving, his grades, his
        classwork, everything, then yes, it has lessened the
        effect -- the ability. . . .

Q:      So his performance is not negatively impacted since
        those interventions and differentiations?

A:      Correct.

Q:      Are there still some small, at least, degree of
        impact -- negative impact, I mean, on his
        performance due to his attentional problems?

A:      It affects his performance. I would not say
        negatively to that degree at all.

Q:      Okay.  But it affects it negatively to some degree?

A:      Small degree, yes.

(4/14/05 Tr. at 80-81.)

A slight impact, particularly in light of all of the record evidence regarding Sidney's ability to perform in a regular classroom setting, is insufficient to establish an adverse effect on Sidney's educational performance.

Consideration of the overall purpose of the IDEA is also helpful to understanding the eligibility regulations.  The purpose of the IDEA is to ensure that the school program provides services sufficient to enable that child to derive some benefit from the educational program.  Rowley, 458 U.S. at 199-200.  A

school may ensure that a student benefits from the educational program by modifying the regular classroom setting such as by providing differentiated instruction.  As Sidney's classroom teacher testified, she would have made similar changes to assist any other student in the class.  (4/14/05 Tr. 68-70.)

While the state regulation could be more specific[3], there is nothing in either the IDEA or in the state or federal implementing regulations to indicate that a student would qualify as a "student with a disability" when the school voluntarily modifies the regular school program by providing differentiated instruction which allows the child to perform within his ability at an average achievement level.  To the contrary, under the state regulations, the school may provide certain related services, even to a student who falls within one of the disability categories, without developing an individualized education program.  Under HAR § 8-56-15(2) a student who has a disability described in HAR § 8-56-16 through § 8-56-29, who only needs a "related service", but not "special education" is not a

---

[3]   The California Education Code, for example, states that to qualify for protection under the IDEA, a student identified by an individualized education program team as a child with a disability must have an impairment that "requires instruction, services, or both, which cannot be provided with modification of the regular school program."  Calif. Educ. Code § 56026(b).  This language makes clear that, when possible, a school may address a child's needs through modification of the regular classroom program without developing an individualized education program.

student with a disability.  See also 34 C.F.R. § 300.8(a)(2).

Because an individualized education program is a written

statement for a student *with a disability* the regulations do not

require an individualized education program for students whose

needs can be addressed through services other than special

education.  HAR § 8-56-2.  This would include addressing the

student's needs through modification of the regular classroom

program.

Some courts have found the adverse effect on educational

performance requirement to be satisfied "if the child's

educational performance would have been adversely affected but

for specialized instruction that the child was receiving."

Greenland School Dist. v. Amy N., 2003 WL 1343023, at *8 (D. N.H.

March 19, 2003) (citing Weixel v. Bd. of Educ., 287 F.3d 138, 150

(2d Cir. 2002), Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1375

(8th Cir. 1996)).

The holdings of these cases do not apply to the facts here.

In this case, the Hearings Officer did not find, and there is no

evidence to show, that Sidney received specialized instruction.

Under the Hawaii regulations, "specially designed instruction" is

part of "special education".  In particular, HAR § 8-56-2 defines

"special education" as "specially designed instruction" which

"means adapting, as appropriate, to the needs of a student with a

disability, the content, methodology, delivery of instruction to

address the unique needs of the student that result from the student's disability and to ensure access of the student to the general curriculum, so that the student can meet the educational standards of the department that apply to all students."

The Hearings Officer found that Sidney received "differentiated instruction" in the classroom such as additional time highlighting and taking tests, being moved closer to the teacher during tests, and having the teacher read the test directions to him, but that "differentiated instruction such as this is available to all children in [Sidney's] classroom and is not an accommodation or different method of teacher, as special education or Section 504 modifications or accommodations would be."  (June 9, 2005 Decision at 13.)  The Hearings Officer further explained:  "Differentiated instruction is a strategy used by the Third Grade Teacher to help students focus, perform and clue in better on the important parts of the lesson. Differentiated instruction is used because each student learns in a different way."  (Id. at 13-14.)  Differentiated instruction is different from specially designed instruction as that term is defined in the Hawaii regulations.

Based on the record evidence, the Hearings Officer correctly found that Sidney was in the average range in his cognitive and achievement scores, and was approaching or meeting proficiency in all relevant content areas identified by the Hawaii Content and

Performance Standards requirements.  (June 9, 2005 Decision at 14-15.)  Teachers must have the flexibility to provide differentiated instruction to all students as needed.  The Hearings Officer's holding that Sidney was not eligible for special education and related services under the Other Health Impaired ("OHI") category is based upon sufficient evidence and sound application of appropriate legal principles.  The record also supports the Hearings Officer's findings of no eligibility under the Mental Retardation ("MR") and Specific Learning Disability ("SLD") categories and under Section 504.

**CONCLUSION**

In accordance with the foregoing, the Court HEREBY ORDERS that:

1.     The Hearings Officer's June 9, 2005 Findings of Fact, Conclusions of Law and Decision is **AFFIRMED**.

2.     Plaintiffs' request for attorneys' fees and costs under 20 U.S.C. § 1415(e) is **DENIED**.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, January 23, 2007.



_____
        /S/ Helen Gillmor
Helen Gillmor
Chief United States District Judge

---

ASHLI and GORDON C., indiv. and on behalf of their minor child, SIDNEY C. v. STATE OF HAWAII, DEPARTMENT OF EDUCATION, et al.; Civ. No. 05-00429 HG-KSC; **ORDER AFFIRMING THE JUNE 9, 2005 DECISION OF THE HEARINGS OFFICER AND DENYING PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES AND COSTS**